Ready whenever you are, Counsel. Thank you. Good morning. May it please the Court. The issue in this case is whether the District Court improperly granted summary judgment to defendant. And, of course, on the motion for summary judgment, all the facts and inferences that can be drawn therefrom are to be taken in the light most favorable to the plaintiff. The facts in this case are not very convoluted. First, my client was employed in 1999 as an Amtrak train attendant. He was later promoted to assistant conductor, and then for the last seven years of his employment, he was a conductor. In his 16 years of employment, he had three relatively minor infractions that would be considered disciplinary actions. Now, he was terminated on April 19, 2015, or he was given notice, I'm sorry, on May 6, 2015, that he was being recommended for termination by his supervisor, a fellow named Michael Hibbert. Mr. Giles was covered under the Sheet Metal Airlines Railway Transportation Union. He was covered by a collective bargaining agreement. After he received the notice of the proposed termination, he pursued a grievance through that. Under that collective bargaining agreement, there was a hearing before an arbitrator. The arbitrator ruled against him, and the decision of the arbitrator was upheld by the public law board. Now, as much as he disagrees with the decision of the public law board and the arbitrator, he accepts that decision. So for all intents and purposes, references to the collective bargaining agreement are over and done, and he is not pursuing at this level an interpretation of the collective bargaining agreement. He said, it's done. You've made the, or the board has made that decision. So the question then becomes whether in looking at the termination, we can look to what happens before a recommendation of termination is made, and that's the issue that Mr. Giles brings to you. The collective bargaining agreement is invoked when management decides to take a disciplinary action against an employee. If it doesn't decide to take a disciplinary action, then it's not invoked. I'm not arguing about the shades of discipline or the levels of discipline, but the mere decision by management to commence a disciplinary action or not commence a disciplinary action. Now, this is a discharge case, and as such, we have to prove that Mr. Giles was in a protected class, he suffered the adverse action of discharge, that he was performing at the company's expectations, and that others similarly situated to him outside of the protected class were treated better. There's no question about the first two elements. And we say that evidence that the plaintiff submitted, what the inferences that can be drawn there from,  Now, meeting expectations does not mean, this court has said, that he has to be the perfect employee or he has to have a perfect record. Whether his performance is satisfactory was stated in this record by his supervisor, who said that he was a good conductor and that he followed instructions. So there is evidence in the record from his own supervisor that he was a good employee and following instructions. Whether a person is meeting the expectation can be and should be evaluated based on whether they are treated differently from others. And that's a question of fact. In Hong versus Gutierrez, the plaintiff there was able to show that while the defendant said she was not performing satisfactorily, that there had been evidence from her own supervisors that they had told her that her work was good. They complained that her work was not turned in in a timely manner, but yet also admitted that she had in fact turned in her work in a timely manner. So she was being evaluated differently than others. And so then the question is, what really were those expectations? And this court in Haynes said that you can look to, and that's Haynes versus Waste Connections Inc. out of South Carolina, that you can look to how the company says it expects performance and how it actually evaluates that. And so in this case, Mr. Giles claims that his performance was satisfactory. Can you just talk a minute about the insubordination? Sure. Well, I know, but we're going to run out of time if we don't get to it. So, all right, you can be really good at your job. One of my clerks over there, he writes well, researches, does all that thing. But if I ask him to do something and he says no, I refuse to do it, barring some limitations on what I can ask him to do, that's insubordination and he's going to get fired. That would be insubordination. And you would be justified in firing him if other people did the same thing but were not fired. I would be justified in firing him if other people did the same thing and were not fired. And were not fired. So I could fire him in that scenario. We're not arguing that an employer cannot take a disciplinary action against an insubordinate employee. What we are arguing is that if insubordination is that important and that critical as a part of this disciplinary process, then the court needs to look to see whether similarly situated people outside of the class engaged in insubordination. Well, in that regard, do you have any non-hearsay evidence regarding Mr. Martino's allegedly insubordinate behavior? Your Honor, I take the position that the statement of Mr. Hibbert, the supervisor, falls under 801D2D, which says that a statement by an agent or someone acting on behalf of the company within the scope of that employment taken during the relationship is not hearsay. Now, I am not arguing to you the statement of the coworkers as to what Martino and Hibbert said fall a non-hearsay. I'm not making that. I'm only talking about Hibbert. Well, in that regard, would the company be entitled to consider the severity of the insubordination? For example, refusing to decouple a car has some significant safety issues as opposed to refusing a schedule. Your Honor, insubordination is insubordination. The degree of discipline may vary, but in this case, the record is void of any disciplinary action being taken against this white comparator. And? So, counsel, I mean, assuming that the party and interest provision applies, the record does talk about what Judge Floyd said, that this refusal to do an act affected safety. So it seems maybe you're right. I mean, certainly it could be reflected in a different type of punishment or disciplinary action. But doesn't it also go to whether they're similarly situated? If I may, Your Honor. For sure. Yes, it goes to whether they are similarly situated. But when you're looking at the defendant's reasons for these two not being similarly situated, they raise a question of safety versus scheduling. If safety is so important to this company, it should be concerned about all safety. And our evidence shows that there was a white individual who threatened to kill a coworker. And he was not disciplined. So the law is that there is a question of fact. This articulated reason does not have to be taken face value just because the company articulates it. If the plaintiff puts evidence forward to question or bring into question the veracity of that articulated reason, then he should survive summary judgment because all of the inferences are supposed to be taken in his favor. Does it matter at all, maybe under pretext or maybe another thing, does it matter at all the level of kind of scrutiny that was placed upon this action? That not only did you have the termination, but you had a review of that through the grievance process at multiple levels, all concluding the same thing. I mean, I know you started off by saying you're not really questioning what happened through the grievance process, but is that something that we should just kind of ignore that not only do you have the company doing it, but you have a collective bargaining process that has some degree of, I guess, favoritism or intent to protect employees. And they don't just affirm. They talk about gross insubordination. Your Honor, you cannot excuse discriminatory conduct simply because the case presented to the grievance board was affirmed by the panel. What would help you distinguish between the actions taken with respect to the comparator and my client is, did the company at the first level, at the first level, say some discipline should be imposed? I'm not arguing the severity of the discipline necessarily, but if there is a disciplinary act or violation and no action is taken, and let's talk about the severity. What we're talking about is taking the train apart. They had dragged that train from New York to Raleigh, and they were just uncoupling it. It wasn't a question of whether the train was going to run off the track. And by refusing to work a schedule, the comparator also put safety in issue. There are minimum staffing requirements on the train. The conductor is an important part of this. The record shows the duties and responsibilities of the conductor. And so if you're talking about sending a train out where somebody has refused to perform work, then seriously, there's a safety question there. And I'm not going to ask the court to get into a weighing or a valuing of what the defendant says it needs to run, how it needs to run its business. I think the court is clear that you're not going to sit as a super personnel body. But the action of not even raising a disciplinary action or a violation is a problem. In your opening brief, did you argue that Mr. Hibbert's statement about Mr. Martino met the hearsay exception? I'm not sure that I did. I don't think that I did, but I'd be happy to. I mean, if you didn't, is it not waived? No, Your Honor, because we contended throughout the essence of the evidence that the statement was from a manager, was in the course of his work and within the scope of the work that he was doing, and he was employed when he did it. I would like to say, Your Honor, also, that on the question of whether race was a but-for factor, we can consider other evidence of race discrimination. And our evidence shows that there was a culture of acceptance of inappropriate racial behavior, including a noose being in the workplace, racial epithets, including calling African-American women black big mammies, racially derogatory sticking papers in locker rooms, and even— You've got some time on rebuttal that you can continue to raise these arguments if you'd like. Thank you, Your Honor. Thank you very much. Counsel, we're happy to hear from you. Thank you. May it please the Court, my name is Steve Dellinger. I represent National Corporation—excuse me, I represent Amtrak here. And let me start off by saying that there is no recommendation from the supervisor here, Hebert, with respect to a termination. All that was done was he was placed—Mr. Giltz was placed on a suspension. It was left up to the arbitrator to determine whether or not the suspension falls within the confines of the collective bargaining agreement and was a major offense, and was also up to the arbitrator to determine whether or not it would warrant termination. So there's no recommendations being done at all. In fact, the sole purpose of the investigation, the investigatory hearing, is to determine what occurred. And it is correct, there's really no dispute about what really occurred here, and that was that Mr. Giltz refused on three separate occasions to train master Amy Saenz that he was not going to participate in the uncoupling of the train. In addition to that, it's also undisputed that he did not participate in the briefing associated with uncoupling the train. He testified that the purpose of a briefing is to make sure that everyone knew their job and to make sure that it was a safe operation. Now, uncoupling is more than just unhooking it. As the record shows, you have to know what you're doing, you have to have certain steps in place, because it's subject to, really, electrocution. So there are safety concerns here that are in play. In fact, of the charges that were brought and looked at, there were five charges. Three of those have a safety component in them. So to argue that insubordination is just insubordination is incorrect. You've got to look at the comparable seriousness, and I'll use that in quotes, and that's from the Supreme Court decision of McDonald versus Santa Fe Transportation. It's a 1976 decision. In addition to that, later on, the Supreme Court, in Helms versus Salem, said you have to look at the gravity of the offense relative to what occurred. So if you really take all this together, you do need to look at the comparator here. In fact, their whole case here rises and falls on whether or not this Tony Martinero is, in fact, a comparator. Now, you've asked some questions with respect to, and she concedes, that the declarations are inadmissible. So all that's left is an alleged statement by Mr. Gills that he spoke to his supervisor, and the supervisor said this guy doesn't even identify the guy, has refused my orders twice, and spoke to me in an aggressive fashion. That's all that we have, assuming that's even it. And I question whether it's in, because while she wants to argue that it is offered against an opposing party, what we don't know here, and what's required according to Hassan versus Caldera, which is a 2000 decision from this court. I'm sure that I understand. So the evidence we've got is Mr. Giles saying that Mr. Herbert said that this other employee refused an order. That's correct. And so the truth of the matter that's being asserted is that the other person refused an order. That that is the truth of the matter asserted. That is correct. Right, and so it's not that it, so if it was something Mr. Herbert was for the truth of the matter, that'd be a statement by a party opponent. That's correct. But here the statement is by Mr. Martinero? Martinero. Whoever it is, whoever this individual is, like that's the statement that's being asserted for the truth of the matter, right? That that person was insubordinate. That's correct. Right, that action, those statements, I refuse, is the statement being asserted for the truth of the matter. That's correct. So I'm not sure I understand, frankly, why it falls within the exception. Well, because, again, we have, if you're going to argue that that statement is a statement against a party opponent, that what you're hearing here is that the supervisor is relaying this conversation to Mr. Giles, and that is somehow a statement against a party opposing party. What we don't know here is whether or not the supervisor, the ability to do something about it, even falls within the realm of the supervisor's authority at that time. So what I mean by that, for instance, we don't know whether or not the supervisor has the authority to write employees up. We don't know that. We don't know whether the supervisor here has the authority on his own to do anything. In fact, Mr. Giles kind of undercuts that entire argument because he says that he doesn't even believe the supervisor was the one who made the decision to write him up. He says that he was told to write him up, but he doesn't identify who that extra person is. So Mr. Hibbert could have said a lot of things, but we don't know whether or not that even falls within the realm of his authority. And if it doesn't fall within the realm of his authority, well, then it can't be a statement against an opposing party because there's nothing to back it up. But even if you want to assume, for instance, that this statement is allowed to get in, again, there's a completely different concept here between not working an extra shift in schedule, which there is no evidence on the record that created a safety issue at all with the train. In fact, the brief by Mr. Giles shows that it was easily rectified. They got somebody else, another conductor, to finish the train onto Washington. So there's no safety component here. Can I kind of go maybe back to a threshold issue that you argued, the preemption of the act? I want to explore that a little bit. You claim, and I know the district court is ruling on this, but since you appealed that, you indicated or claimed and argued in your brief that the issues here require an interpretation of the collective bargaining agreement. But you never really identified the provisions of the agreement, or at least that I could tell, what you were talking about. So help me understand that. I mean, if you're saying that any grievance that comes up is preempted, that's one thing. But you haven't identified in any way that I could tell what the actual provisions were and what interpretation was required. It's whether or not the actions constitute insubordination, which is identified in the collective bargaining agreement, as a serious offense. I mean, in any grievance, if that's the answer, it seems like almost any grievance would require an interpretation of it. I don't believe any grievance would require the interpretation of the collective bargaining agreement. But when you've identified a particular rationale for why someone is being terminated that falls within the definition or within the terms of the collective bargaining agreement, here, insubordination, the issue is, does it in fact, is it in fact insubordination, or is it not insubordination? If it's not insubordination, you've got to look at the collective bargaining agreement to make that determination. And so, for instance, and if you have also here, look at Mr. Gill's entire defense here. His entire defense is, yeah, I refused it. He says, so his excuse is, is trying to argue, it really doesn't fall within the concept of insubordination. I wasn't insubordinate because I didn't know who she was. I wasn't insubordinate because I thought Would it make any difference if there was no insubordination provision in the collective bargaining agreement for this case? And that's where it sort of gets at, right? Yes, I believe it would. If there's no insubordination term in the contract where it said that it was a serious offense or a major offense, I wouldn't be making this argument because it would be something that there's no interpretation needed in order to make this decision. But the Railway Labor Act That wasn't the question I was trying to ask, but let me come back to it. So the challenge here is that if there was no insubordination, I'm asking hypothetical, I understand that. If there was no insubordination provision in the collective bargaining agreement, and even so, seemingly reasonably, you fired somebody for insubordination, even though it wasn't in the agreement itself, and didn't fire a white guy who did the exact same conduct, whatever we want to call it, then we would have a claim in this context that wouldn't depend on the collective bargaining agreement at all. That is 100% correct. Assuming insubordination is not part of the contract. I don't imagine that the scenario you've got, which is insubordination is prohibited, but the plaintiff is not claiming that the collective bargaining agreement applied or was improperly applied against him or this other person, but just that they engaged in comparable conduct and were treated differently. It doesn't turn on the collective bargaining agreement at all. But that's not what Mr. Gills is doing. He's actually arguing here to some extent that, in fact, what's occurring here is that I was not insubordinate. He's not, and because you have to look at the contract, because it's a term in the contract, and it requires an interpretation of whether or not he fell. Help me understand. Where am I looking at for the complaint for him to say that he was improperly fired for being insubordinate? I don't see that argument. I get you want to add to some extent in your statement, but help me understand. What part of the complaint does he allege that he was not insubordinate and therefore should not have been fired? Well, you look at his deposition testimony, and you look at also the hearing transcripts. I've got to look at the complaint, right? I mean, whether it applies or not turns on the complaint, doesn't it? Well, I would say that the complaint is a factor. Start with telling me where in the complaint I might look. There is nothing in the complaint that says— And then in the deposition, tell me where you want me to look for the proposition that, for purposes of this case, not just that he believes it in his heart, but that his claim depends on him being improperly fired because he was fully subordinate. Well, you're looking for the record pages right now. Or you can just describe it, right? When he says—I mean, I don't understand how in a deposition he makes a legal argument. But when he does, help me understand where it is. What part of the record? We can find it, but just describe it. Again, what he's trying to do—he's not making a legal argument. He's making a factual argument. The fact is I didn't do something that falls within the confines of insubordination. And he does that because he tries to excuse the conduct and says, I was told previously by my supervisor that the Raleigh group was going to actually uncouple the train. Then in addition to that, I also didn't know who she was. So I can't be insubordinate to someone because I didn't know who she was. I didn't know she had authority to come ask me to tell me to come do some things. I'm just—my memory, and you know the record better than I do. I mean, certainly he's, I think, as a factual matter, you know, explaining what he did and why he did it. But I think the question is less about that and more about the claims. And so if he was asked questions and he gave his explanation and all that, that may be in the record. I kind of think I recall that as well. But if the claims are all based on a separate statute, which I think—I don't remember the citations—I think is what we have here, it seems like when you get to his legal theories here, they don't depend on that. And maybe that's what I was trying to figure out is, you know, how does this relate to the actual claims he asserts? Well, again, I read the Hawaiian Airlines v. Norris Supreme Court decision. It says that a matter is preempted if it cannot be adjudicated without interpreting the terms of the collective bargaining agreement. So even though you might have a separate statute he's trying to bring it under, it doesn't matter. If, in fact, you can't address the issue without interpreting the collective bargaining agreement. Here, it's our contention that you can't get into this whole issue without looking at the CBA and whether or not his actions fall within the confines of insubordination. And because you have to look to the CBA, it just preempts everything else. That's the whole concept of the preemption aspect of this. It's going to preempt Section 1981 in this instance. In fact, other courts have reached this conclusion. In Brown v. Illinois Central Railroad, a case cited in our brief, the Seventh Circuit held that America's Disabilities Act claim was preempted where the plaintiff's claim required a potentially dispositive interpretation of the CBA seniority provision. In Dobson v. Norfolk, a Fifth and Sixth Circuit in a despair impact case alleging differences in discipline said because it required a view of what constitutes discipline preempted a Title VII claim. And so there might be other claims out there that he's trying to allege. That's not the issue. The issue is whether or not the Railroad Labor Act preempts it. And again, according to the Supreme Court decision, it's only independent if you don't need the CBA to help adjudicate or is needed to adjudicate the claim. Here, because of what he's saying, is I didn't engage in insubordination. You've got to look at the CBA to determine whether or not he engaged in insubordination, which is exactly what's all occurred with respect to the alternative. Judge Russell may have asked this. If he were to concede his conduct could be construed as insubordination for purposes of this case and say you just didn't treat similarly situated people similarly. In that situation, you'd agree there's no preemption? I would agree if he concedes to that because there's no dispute as to the meaning of insubordination with respect to the CBA. Okay. In that situation, Hibbert told him who Sines was and that he still refused to participate in the decoupling. Actually, there's a little bit of disputed fact on that. You'll see that the district court raised that and said that that was our claim and that's what our evidence showed, Your Honor. But there's a little bit of dispute by that. The plaintiff claims that after he learned through Hibbert who Trainmaster Sines was, he then immediately went and started uncoupling, which raises another issue, which is the whole safety component because what he did was he then started to do something that he didn't engage in the safety briefing beforehand, which he himself testified was something needed and necessary, and which, again, a major factor, the distinguishing any conduct that you have between him and Martino. And, in fact, there's other distinctions associated as well with that. If even a taking is true, the fact that Martino refused an order, again, we don't even know that this guy is actually Martino, but assuming that it is, he did it twice. Well, Gills did it three times. You've also got the fact, too, that something really significant here is you have a direct challenge by Mr. Gills to Trainmaster Sines where he says to her, well, I'll take my chances at a hearing. So she tells him what to do. He pushes back and says, you can't do anything to me. I'll just take my chances at a hearing. That is a direct challenge to her. We don't have that with Martinero. We don't have him say, well, take me to a hearing. What are you going to do about it? Martinero, at best, just says he isn't going to do it, and that kind of ends it. And then they find somebody else, supposedly, to conduct the training. And then I think the other aspect of this is that who it was made in front of. This was a factor that both the hearing officer, Mullen, and the public law board thought was very important. With respect to the situation as it pertained to Trainmaster Sines, there were two witnesses that saw it, that were there and present with respect to what occurred. And then with respect to him being insubordinate by not going through the briefing but all of a sudden jumping on with the uncoupling of the train, there were passengers and DOT officials, which DOT officials are partners for Amtrak. Am I out of time? Can I finish my sentence? Sure. Thank you. And the board, and Mullen and the public law board,  And if you then take a look at all the cases cited, that is a truly showing the fact that when you look at comparable seriousness, the actions of Mr. Gills were far more egregious than that of Mr. Martinero. Thank you. Thank you, Counsel. We've got a few minutes on reply. Thank you, Your Honor. First, at page 251 of the record, there is a form that says Discipline Assessment Workshop. It has my client's name on it. It has the date of the incident. And it has Manager Recommending Discipline, Michael Hibbert. It's dated May 5, 2015. And the recommended discipline was dismissal. So Mr. Hibbert. But that's a recommendation, right? That then is decided by. It has to start from some manager, and it started with Hibbert. Right, but if he had recommended something else, the ultimate decision is not his. Whether he recommends dismissal or whether he represents a baby Ruth, in both instances, the decision is not his. That's true. But I was bringing that to your attention because counsel said that Mr. Hibbert did not make a recommendation and did not make a recommendation of termination. So I wanted to correct the court, bring that to the court's attention. Let me, Your Honor, say that the language in the record, in the deposition, shows that Mr. My client, Mr. Giles, spoke more than once about his conversation with Hibbert. But in particular, it says this, he quotes Mike Hibbert as saying, this is the second time that this guy has refused my direct order and verbally abused me like this. So it wasn't just, I'm not going to do it. But he was verbally abusive towards his manager. And in addition to that, he did not complete the work. So we believe that the evidence here is sufficient to raise a question when the evidence and all of the inferences taken in the light most favorable to Mr. Giles is sufficient to present this evidence to a fact finder and not have it decided on a motion for summary judgment. Now, there were witnesses, there were people at the train station in Raleigh. The record shows that one of the witnesses testified that he couldn't hear anything. And there's evidence in the record that there was a lot of noise around there so that they couldn't hear anything. So any discussion about what was said was not in this record. So those witnesses could not vouch for any comments that my client made to Ms. Simons. Now, on the issue of whether race can be attributed or race discrimination can be attributed to the decision maker, I think the court recognizes Estalve v. Proctor says that if there is race somewhere, evidence of race discrimination somewhere in the decision process, that it can be imputed to the decision maker. And what we have here is evidence of Hibbert himself using racially offensive language and ratifying behavior by others as well, subordinates to him or non-management persons. And we have evidence in the record that another manager, Mr. Whitlow, also engaged in that conduct. We have evidence that that behavior was complained about by African-American employees and that it continued. It was, there's evidence which is not disputed, that the white employees who engaged in that behavior were not disciplined. Now, you don't have the actual contract in this record. What you have is a little handbook that sets out, quote, standards of excellence. And those standards of excellence talk about being disrespectful, which is one of the charges that was brought against Mr. Giles. There's also evidence that none of those people who had engaged in that offensive conduct were ever disciplined. And that kind of behavior, at a minimum, you would say was rude. You would say that it was disrespectful. So if we're looking at evidence and inferences of evidence of discrimination, I think that the plaintiff has met his burden, has met the burden of proving the prima facie case, and when all of the evidence is merged, is sufficient to defeat a motion for summary judgment. And I thank you for your time. Thank you, Counsel. As you now know, having sat through a couple of these, we wish we could come down and greet you in person and shake your hands, but I hope you'll come back soon and we'll resume our tradition when you're back next.
judges: Julius N. Richardson, A. Marvin Quattlebaum Jr., Henry F. Floyd